### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 1:18-CR-00083-HAB-SLC** |
| | ) | |
| **BRADLEY M. COX** | ) | |

### REPORT AND RECOMMENDATION

Before the Court is a motion to suppress based on alleged violations of *Miranda* filed by

Defendant Bradley M. Cox.  (ECF 47).  Defendant seeks to suppress statements he made to

investigators on August 22, 2018, outside of his home and August 23, 2018, at his work office

respectively.  Defendant alleges that both sets of statements were elicited by means of custodial

interrogations, performed without *Miranda* warnings, and should therefore be suppressed.

#### A.  Background

On September 26, 2018, Defendant was indicted and charged with violating 18 U.S.C. §

2251(a), sexual exploitation of children.  (ECF 17).  On February 27, 2019, the Government filed

a superseding indictment, alleging violations of 18 U.S.C. § 875(d), interstate communication of

threats to damage reputation (Counts 1, 3, 4); 18 U.S.C. §§ 2251(a) and (e), sexual exploitation

of a minor (Counts 2, 5); and 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1), receipt of child

pornography (Count 6).  (ECF 34).  Defendant pled not guilty to these charges on September 28,

2018, and March 1, 2019.  (ECF 21, 38).  On March 3, 2019, Defendant filed the present motion

(ECF 47), and the Government responded on April 4, 2019 (ECF 50).  The District Judge

referred this matter to the undersigned Magistrate Judge for a report and recommendation

pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72-1.  (ECF 55).

On April 17, 2019, the Court conducted an evidentiary hearing with respect to

Defendant's motion to suppress his statements made to investigators.[1]  (ECF 59).  On July 24,

2019, Defendant filed a post-hearing brief in support of his motion (ECF 62), to which the

Government responded on August 26, 2019 (ECF 63).  Defendant subsequently filed a reply on

September 11, 2019.  (ECF 67).  After considering the evidence and argument submitted by the

parties in this matter, I RECOMMEND that Defendant's motion to suppress be DENIED.

*B.  Findings of Fact*

At the evidentiary hearing, the Government offered the testimony of FBI Special Agent

Jason Stewart, FBI Special Agent Joseph Gass, and Rochester Indiana Police Detective

Lieutenant Matt Campbell.  (Tr. 1).  Defendant offered no new witnesses, but recalled Special

Agent Stewart.  Special Agent Stewart was the lead FBI investigator in this matter and led the

interviews of Defendant on August 22 and 23.  (Tr. 6-7, 21-22).  He has worked as a FBI special

agent since May 2017, and was previously a police officer in Knoxville, Tennessee.  (Tr. 5).  On

August 22, Special Agent Stewart was assisted by his partner, Special Agent Gass, who has been

employed by the FBI since October 2010, and was formerly an evidence technician for the

Indiana State Police.  (Tr. 96-97).  Both were assigned to the Fort Wayne field office at the time

and worked criminal matters, including violent crime.  (Tr. 5-6, 97).  Detective Campbell has

worked as a law enforcement officer for the Rochester Police Department for twenty-six years,

specifically as a detective for the past seventeen, and was one of the local law enforcement

officers to initially investigate the underlying scheme here.  (Tr. 114-15).  The testimony of

Detective Campbell and Special Agents Gass and Stewart was not contested in any meaningful

---

[1] The Court will refer to the transcript of the hearing (ECF 61) as "Tr. __."

way at the hearing, and I FIND their testimony to be entirely credible.[2]

In May of 2018, Special Agent Stewart began assisting local Indiana law enforcement agencies investigate a scheme in which individuals were being extorted for sexually explicit material via Facebook accounts. (Tr. 6, 110, 115). Through the course of his investigation, Special Agent Stewart came to learn that the target of the investigation had used a virtual private network ("VPN") in an attempt to hide his IP address, encrypted messaging apps, and had reactivated dormant Yahoo email accounts. (Tr. 8, 59, 61, 80). Special Agent Stewart had, though, been able to find an IP address associated with the scheme that could be traced to Burns Post Construction in Macy, Indiana. (Tr. 7). On August 22, Special Agents Stewart and Gass traveled to Burns Post Construction. (Tr. 7). While it is unclear from the record how much information they may have known about the employees there, the agents did at one point run the license plate information of the cars in the parking lot, learning that one of the cars was owned by Defendant, Bradley Cox. (Tr. 44-45). Special Agent Stewart also testified that he may have run a criminal history check on Defendant. (Tr. 44-45).

Upon arriving at Burns Post Construction, Special Agents Stewart and Gass spoke with the office manager and later the company's owner. (Tr. 7). After speaking with the owner, Special Agent Stewart determined that Defendant was a person of interest in the investigation, and requested and received permission to search Defendant's work computer. (Tr. 8). Through the search the special agents found evidence of two VPNs, one of which was the same type as had been identified as being used in the underlying extortion scheme. (Tr. 8). The special

---

[2]To the extent that Defendant suggests the credibility of the witnesses' testimony is undercut by the lack of audio or video recordings of the interviews in question, that argument—which is unsuccessful—is discussed *infra* in section D.3.

agents then requested and received permission to take and image the computer's hard drive, and decided to interview Defendant, who had already left the office, at his home in Kokomo, Indiana. (Tr. 8).

Both Special Agents Stewart and Gass testified that they arrived at Defendant's home, which is located in a residential neighborhood, in the early evening in an unmarked car which they parked on the side of the home. (Tr. 10, 98). Both testified that Defendant answered the door when they knocked, and that Special Agent Stewart asked Defendant if he would step outside and speak with them. (Tr. 11, 99). Special Agent Stewart further testified that he had asked Defendant to step outside because of the sensitivity of the subject matter being discussed and to not burden Defendant's family. (Tr. 12, 99). Defendant agreed to speak with the agents, and the three proceeded to have a conversation on the sidewalk and front porch directly in front of the house. (Tr. 13, 99).

Both special agents' testimony suggests that the interview was non-confrontational. Special Agent Stewart testified that he identified himself and Special Agent Gass as FBI Special Agents. (Tr. 12). Each were in plain clothes at the time. (Tr. 10, 86). At no point did either show or produce handcuffs or their firearms. (Tr. 19, 106-07). Additionally, neither raised their voices or ordered Defendant to speak with them. (Tr. 20, 107). Special Agent Stewart testified that the tone of their conversation was "calm," while Special Agent Gass described it as "cordial." (Tr. 20, 107). Special Agent Stewart led the interview, asked the majority of the questions, and informed Defendant that he was free to not talk to the agents, to end the interview anytime, and that "there was no scenario where [Defendant] left in custody [at the end of the] conversation." (Tr. 14, 15, 100). Finally, neither blocked or obstructed Defendant's path to his

house.  (Tr. 106).

Furthermore, both special agents testified that Defendant, while cooperative, initially denied any involvement with the alleged extortion scheme.  (Tr. 53-55).  At some point, though, Special Agent Stewart informed Defendant of two potential "options":  (1) if he cooperated, and charges were eventually filed, Agent Stewart would arrange for Defendant to turn himself into authorities at a time convenient for him, or (2) if he was uncooperative, and charges were eventually filed, he would be arrested at the Government's convenience.  (Tr. 14-15, 55, 89, 93, 101).  Both special agents testified, on direct and cross examination, that Defendant responded with a third "option," namely that he would work with and provide information to the Government for consideration from prosecutors if he was ever charged.  (Tr. 15, 69, 101).  Again, both agents testified that Special Agent Stewart informed Defendant that they had no authority to enter into promises in exchange for information, and that any decisions as to charging or leniency would be made by the United States Attorney's Office.  (Tr. 91, 102).  Special Agent Gass also testified that he at one point, after Defendant mentioned his children, asked Defendant to consider whether he would want his children to "think of their dad as someone who has possibly done something bad . . . or would [he] rather them know that . . . he's doing the right thing, he is helping make rights for his wrongs."  (Tr. 109).

Defendant soon after made statements regarding names, Yahoo accounts, and the process for recreating dormant Yahoo accounts used in the scheme Special Agent Stewart was investigating.  (Tr. 16, 59).  Defendant also allowed the special agents to photograph his phone showing the messaging app used in the underlying scheme, and provided written consent for them to take and search his laptop.  (Tr. 17, 103).  Special Agent Stewart testified that he could

not remember if Defendant offered to get the laptop from inside the house, while Special Agent Gass testified that he asked if he could retrieve it. (Tr. 56, 112). Special Agent Gass further testified that had Defendant asked to retrieve the laptop, he would have requested that either he accompany Defendant or that one of the agents retrieve it due to safety concerns. (Tr. 112-13). Both Agent Gass and Stewart testified that Agent Gass knocked on the door and requested that Defendant's "girlfriend or fiancé" bring them the laptop. (Tr. 21, 105).

Special Agent Stewart eventually chose to terminate the interview as the sun began to set, assuming Defendant, who was wearing a tank-top shirt, was getting cold. (Tr. 18). Special Agent Stewart initially testified that he had begun the interview at approximately 6:00 pm and ended it ninety minutes later. (Tr. 9, 20). However, after being shown on cross examination the photograph of Defendant's phone, showing a time of 9:14 pm, Special Agent Stewart testified that he must have been wrong about the start time. (Tr. 51-52). In any event, Special Agent Stewart testified on cross examination that the interview could have lasted longer than two hours, but no more than three. (Tr. 52, 58). Special Agent Gass testified that the interview lasted "maybe an hour and a half, two hours." (Tr. 107). Special Agent Stewart gave Defendant his cell phone number, and Defendant apparently tried to contact Special Agent Stewart about the investigation the next morning, but was unable to, having mis-entered the number into his phone. (Tr. 24-25). The interview was not electronically recorded. (Tr. 32).

The following day, August 23, Special Agent Stewart went back to Burns Post Construction to return the computer he had taken the day prior for imaging. (Tr. 22). On that day he was accompanied by Rochester Police Detective Lieutenant Matt Campbell. (Tr. 23, 116). After returning the computer, the two began a second interview of Defendant in his office.

6

Both testified that the office was "small." (Tr. 74, 122). Special Agent Stewart also testified that upon entering the door there is a space for "multiple people to stand and then there's [Defendant's] desk." (Tr. 74). During the interview, Special Agent Stewart was across from or along the side of Defendant at his desk, while Detective Campbell stood near the door. (Tr. 74, 122-23). Special Agent Stewart testified that, as was done at Defendant's home, he shut the door to the office due to the "sensitivity" of the conversation. (Tr. 26).

Again, both Special Agent Stewart and Detective Campbell testified that they were in plain clothes, that neither yelled or raised their voices, applied any force to Defendant's person, threatened Defendant, or displayed or unholstered their firearms or handcuffs. (Tr. 30-31, 117, 119-21). Special Agent Stewart testified that he told Defendant multiple times that he was free to end the interview, that he and Detective Campbell would leave if requested, and that Defendant was not under arrest. (Tr. 27-29). Again, Special Agent Stewart reminded Defendant that he was not authorized to make promises regarding potential leniency from the United States Attorney's Office, and that he in fact made no promises to Defendant. (Tr. 31). This included no promises regarding working for or potentially working for the FBI. (Tr. 29). At the eventual end of the interview, Special Agent Stewart testified that he and Defendant were on "good terms" and even remained in contact via phone and text messages. (Tr. 31-32). Detective Campbell described the conversation at the interview as "nonchalant," and Defendant as "open." (Tr. 120). Special Agent Stewart testified that it was "calm, and even friendly." (Tr. 30).

At this second interview, Defendant apparently made additional incriminating statements to Special Agent Stewart and Detective Campbell. Defendant at one point logged into his "Mega" account, a cloud based storage service, to show to the officers and allowed Special

Agent Stewart to photograph Defendant's computer screen. (Tr. 28). Special Agent Stewart further testified that Defendant turned away his screen multiple times, when there was something he did not want to show. (Tr. 28). Both Special Agent Stewart and Detective Campbell further testified that they eventually ended the interview without placing Defendant into custody. (Tr. 32).

Like the first interview, the second interview was not electronically recorded. (Tr. 32, 71). Special Agent Stewart testified that he had not initially expected to be conducting an interview on August 22 and FBI policy required approval to record any "non-custodial" interview. (Tr, 21, 32). He further testified that he was unsure how the second interview on August 23 was going to go after he returned the computer. (Tr. 71). While Special Agent Stewart initially testified that if he would have wanted to surreptitiously record Defendant's statements he would have needed to get his supervisor's approval, which he could have done via text message, he later clarified that a request to record would have needed the approval of at least three people. (Tr. 73-74, 87-88). Further, depending on who is in the FBI office at the time, the request could take 24 hours or longer to be approved. (Tr. 88).

Defendant was subsequently arrested on September 7, 2018, and initially indicted on September 26, 2018. (ECF 17). As mentioned above, the Government filed a superseding indictment on February 27, 2019. (ECF 34). Defendant in turn filed this Motion to Suppress on March 20, 2019. (ECF 47).

### C. The Miranda Standard

"In the seminal case of *Miranda*, the United States Supreme Court held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from

custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination.'" *United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "The *Miranda* Court recognized that the inherently coercive nature of custodial interrogation could blur the line between voluntary and involuntary statements, and that the prophylactic measures were necessary to protect the constitutional right." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012) (citing *J.D.B. v. North Carolina*, 564 U.S. 261, 299 (2011)).

*Miranda*, however, does not apply to all statements made to law enforcement, but only those made as a result of "custodial interrogation." *See id.* ("The privilege against self-incrimination is not imperiled by every conversation with the government."). "Accordingly, a suspect must be both in custody and subjected to interrogation before *Miranda* warnings are required." *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984); *Miranda*, 384 U.S. at 444; *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2016)); *see also Patterson*, 826 F.3d at 454.

"Custody" in the context of *Miranda* "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). As an initial step, the Court is to determine, whether, in light of the "objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (alteration in original) (internal quotation marks omitted) (first quoting *Stansbury v. California*, 511 U.S. 318 (1994); and then quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Further, in order to so determine, the Court is to examine "all of the  circumstances surrounding the interrogation" including but not limited to:

(1) its duration, (2) its location, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the interviewee at the end of the questioning. *See id.* at 509 (listing cases); *Patterson*, 826 F.3d at 455. Still more factors to consider include:

> whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed.

*Patterson*. 826 F.3d at 455. Overall, though, the inquiry revolves around "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." *Howes*, 565 U.S. at 509. Thus, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Id.* (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)).

### D.  Discussion

Here, the parties do not dispute that Defendant was subjected to interrogation. (ECF 63; ECF 67 at 1). The question thus turns on whether the two interviews took place while Defendant was in custody. *See Patterson*, 826 F.3d at 454 (observing at the outset that the only issue in dispute was whether Patterson was "in custody" at the time of his interview at the FBI office). Because the two interviews are factually distinct, the Court will address each in turn. However, because Defendant raises arguments regarding the relatively short time it takes to give *Miranda* warnings and the lack of audio/visual recordings of the interviews that is applicable to each interview, the Court will address those separately.

*1. August 22 Interview*

*a. Nature of Police Questioning and Surrounding Circumstances*

To begin, Defendant argues, relying on *J.D.B. v. North Carolina*, 564 U.S. 261 (2011), that the very nature of police questioning is inherently coercive, and as such Defendant should have been *Mirandized*.  (ECF 62 at 10).  However, the mere fact someone is questioned by police does not necessarily trigger the warning requirement under *Miranda*.  *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question.").  Rather, the Court must analyze the surrounding circumstance of an interview to determine where there was a "serious danger of coercion."  *Howes*, 565 U.S. at 508-09; *see also J.D.B,* 564 U.S. at 271.

Here, given the surrounding circumstances of the August 22 interview, a reasonable person would have felt free to leave.  To begin, the Special Agents told Defendant as much.  The undisputed testimony of Special Agents Stewart and Gass was that they informed Defendant multiple times that he was not under arrest and was free to terminate the interview at any time. *See United States v. Borostowski*, 775 F.3d 851, 862 (7th Cir. 2014) (stating the fact that the defendant was told he was not under arrest or in custody weighed in favor of voluntariness); *United States v. Littledale*, 652 F.3d 698, 702 (7th Cir. 2011) (considering that although the agents did not tell the defendant he was free to leave, they did assure him he was not under arrest, which weighed against custody).

11

Further, the manner in which the agents conducted the interview suggests that Defendant was not in custody.  Both agents testified that they had parked their unmarked squad car on the side of Defendant's home, and did not otherwise block Defendant's driveway.  The undisputed testimony of Special Agents Stewart and Gass was that they were in plain clothes, that no one at any point showed their firearms, handcuffs, or even raised the voices.  They also alternatively described the interview as "calm" and "cordial."  The Seventh Circuit Court of Appeals in *United States v. Ruiz* addressed a substantially similar factual scenario and found that the defendant was not in custody.  785 F.3d 1134, 1145 (7th Cir. 2015).  In upholding the district court's denial of the defendant's motion to suppress, the Court noted:

> On the "non-custodial" side of the ledger, the entire encounter took place in public view. The district court found that the officers spoke to Ruiz in a calm, courteous manner throughout the encounter, which was designed to make Ruiz feel at ease. The officers were in plainclothes, with no display of weapons or force. The officers' unmarked vehicles did not block the driveway, and the marked squad car was parked across the street, two houses away.

*Id.*

Defendant also argues the fact that the interview occurred at his home, on private rather than public property, favors a finding that he was in custody.  (ECF 62 at 10).  Regardless of whether the interview occurred on private instead of public property, it seems apparent from the testimony of Special Agents Stewart and Gass that the front porch area where it occurred was in the "public view."  "This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [suspect's] fear that, if he does not cooperate, he will be subjected to abuse." *Berkemer*, 468 U.S. at 438 (explaining why a traffic stop on a public street is not necessarily custodial interrogation under *Miranda*).  As such, following *Ruiz* and *Berkemer*, the location of this

12

interview weighs against finding that Defendant was in custody.

Another factor weighing against Defendant is that at no point did any law enforcement officer explicitly order Defendant to speak with them, nor does it appear that any did so implicitly. Special Agent Stewart apparently asked Defendant if he was willing to speak with Special Agent Gass and himself, and Defendant agreed. Both Special Agent Stewart and Special Agent Gass testified that Defendant was similarly informed that he was not under arrest and free to terminate the interview anytime. Finally at no point did the special agents transport Defendant away from his home, or block his path back to his door. Even after the interview ended, Defendant apparently tried to contact Special Agent Stewart regarding the investigation. Again, the Seventh Circuit in addressing substantially similar facts has found that a defendant was not in custody. *See United States v. Fazio*, 914 F.2d 950, 956-57 (7th Cir. 1990) ("Mr. Fazio voluntarily agreed to go downtown to give a statement to police and drove separately in his own vehicle to the municipal building[,]. . . . was informed that he was not under arrest and that he was free to leave at any time[, and] . . . . acknowledged that he understood the situation and that he desired to cooperate. Under these circumstances, we cannot say that the district court erred in determining that Mr. Fazio was not in custody when he gave the incriminating statement and thus was not entitled to *Miranda* warnings." (internal citation omitted)).

    *b. Separation from Family*

Defendant in his briefs also argues that the agents shutting the door of the front house, separating Defendant from his family, cuts in favor of finding that the interrogation was custodial. (ECF 67 at 4). This argument is not entirely without merit. In *Howes*, for example, the Supreme Court noted that "[w]hen a person who is not serving a prison term is questioned,

isolation may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support." 565 U.S. at 512; s*ee also id.* at 511 ("In the paradigmatic *Miranda* situation—a person is arrested in his home or on the street and whisked to a police station for questioning—detention represents a sharp and ominous change, and the shock may give rise to coercive pressures."). The Court, however, goes on to say that separation is not always necessarily coercive, wondering whether the defendant there, a prisoner who was removed from the prison's general population, would have felt more comfortable being questioned about the sexual abuse of an adolescent boy in the presence of other inmates as opposed to in private. *Id.* at 513. The Court concluded that in such cases, isolation may often be in the interviewee's best interest. *Id.*

The facts at issue here are analogous. While separation from one's family may add to the coercive nature of interrogation, in this specific instance, separating Defendant from his family could have been in his best interest by saving him from the potential embarrassment of being questioned about sexual exploitation and child pornography in front of his family. Further, Defendant was only isolated to a relatively minor extent. Unlike the "sharp and ominous change" discussed by the Court in *Howes*, during the August 22 interview Defendant was outside his home in public view, separated from his family only by the front door of his own home. Again, he was told multiple times that he was free to terminate the interview, at which point he would have presumably been able to return his family inside. As such, the factual situation is substantially distinguishable from cases where a defendant's relative isolation suggested custody. *Cf. United States v. Slaight*, 620 F.3d 816 (7th Cir. 2010) (finding that the defendant was in custody when he was transported from his home to a local police station and

14

questioned in a small windowless room).

    *c. Defendant's Laptop*

    Defendant also suggests that his freedom of movement was curtailed when the special agents requested and received Defendant's consent to search his laptop. In his brief, Defendant argues that Special Agent Gass's testimony that he would have not allowed Defendant to enter his home by himself to retrieve the computer suggests that Defendant's freedom of movement was restricted to the level of a formal arrest. (ECF 67 at 5). In other words, Defendant suggests that if he was not in custody, he would have gotten the laptop himself. (*Id.* at 7). Similarly, Defendant suggests that the agent's request that Defendant sign a written consent indicates that they knew or at least thought he was in custody. (*Id.* ("Otherwise, why have him sign a consent for the search of his computer at all?")). Both arguments however are unpersuasive.

    Again, at issue is not the subjective beliefs or thoughts of Defendant, but objectively, what a reasonable person would feel under the same circumstances. Here, the testimony of Special Agent Gass is that Defendant never offered to retrieve the laptop. Rather, Special Agent Gass asked if he could get the laptop before going to the door. Even if Defendant subjectively believed that he was not able to walk into the house to get the laptop, there is nothing to suggest that an objective person in the same position would have felt that Special Agent Gass's request to get the laptop implied that he was not free to leave or otherwise terminate the interview. Moreover, as already mentioned, the freedom of movement inquiry is necessary but not sufficient in determining whether someone is in "custody" for the purposes of *Miranda*. As such, even someone detained during a traffic stop or pursuant to *Terry v. Ohio*, is not necessarily in custody. *See Howes*, 565 U.S. at 510 ("[T]he temporary and relatively nonthreatening

15

detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." (quoting *Shatzer*, 559 U.S. at 112 (2010) (internal quotation marks omitted)).  If a *Terry* stop or a traffic stop does not constitute custody, it is hard to see how Special Agent Gass asking to get the laptop while the Defendant remains on his front porch would be.

Regarding the form signed by Defendant consenting to the search of his computer, Defendant appears to be confusing separate Constitutional protections.  *Miranda*'s warning requirement is rooted in the Fifth Amendment's protection against self-incrimination.  In comparison, the Fourth Amendment protects against unreasonable searches and seizures.  Absent a warrant or exigent circumstances, law enforcement must receive consent to search a subject's property.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  "[W]hen the subject of a search is *not in custody* and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied."  *Id.* at 248 (emphasis added).  In other words, law enforcement can search a person's property without a warrant even if said person is not in custody if given consent, but the State must later prove that such consent was voluntary.  Signed consent waivers are just one way in which the State can attempt to show that a non-custodial search by law enforcement officers did not violate the Fourth Amendment.  *See United States v. Gap*, 403 F.3d 439, 443-44 (7th Cir. 2005) (considering a signed consent form as evidence that consent to search was "freely and voluntarily" given).  The special agents here obviously did not have a warrant, and there is nothing to suggest that exigent circumstances justifying a warrantless search were present.  Accordingly, the special agents needed Defendant's consent to search his computer.  Thus, the

16

mere fact that the agents requested that Defendant sign a consent form does not suggest that he was in custody.

   *d.  Length of the Interview*

Defendant also argues that "[t]he duration of the interrogation on August 22nd was a primary indicator that a reasonable person would not feel free to terminate the interrogation." (ECF 62 at 10).  The testimony of both Special Agents Stewart and Gass suggests that the interview lasted roughly two, but possibly up to three hours.  As mentioned above, duration is one factor to consider in determining whether a suspect was in custody for purposes of *Miranda*. *See Berkemer*, 468 U.S. at 437-38 (noting that traffic stops do not necessarily warrant a *Miranda* warning in part because suspects generally are aware that they will only be briefly detained).  Here, an interview by two FBI agents regarding an extortion and child pornography investigation obviously does not suggest a quick, relatively short detention in the same manner as a run-of-the-mill traffic stop.

It is not clear, however, precisely how long an interview may last before it sufficiently resembles a formal arrest to warrant a *Miranda* warning.  The Seventh Circuit on *habeas* review has held that a "reasonable jurist" could find that an interviewee was not in custody during a "roughly ninety minute" interview by both uniformed and plain-clothed police officers, while confined to a hospital bed as the result of a self-inflicted gunshot wound.  *Stechauner v. Smith*, 852 F.3d 708, 715-716 (7th Cir. 2017) (noting that "the duration of the questioning was relatively short"); *see also Yarborough v. Alvarado*, 541 U.S. 652 (2004) (finding on *habeas* review that a reasonable jurist could hold that a roughly two hour interview did not constitute custody).  In both *Yarborough* and *Stechauner* the court focused on the relative freedom of the

17

defendant. *See Stechauner*, 852 F.3d at 716 ("Stechauner was not placed in handcuffs or other restraints, and there is no indication of coercion, deception, or use of force on the part of the police."); *Yarborough*, 541 U.S. at 664 ("The police did not transport Alvarado to the station or require him to appear at a particular time."). Similarly, in at least some circumstances, the Supreme Court has found that a nearly three hour interview is not "inherently coercive."[3]

In contrast, in *Borostowski*, the Seventh Circuit held that two hours of questioning weighed in favor of custody. There, however, the defendant was questioned immediately after thirteen armed police officers executed a search warrant on his home, handcuffed him, escorted him to a bedroom, blocked him from the door, and eventually arrested him. 775 F.3d at 861-62 ("The day began with handcuffs, continued with a constant personal guard of one or two agents, moved into a small room where an agent stood between Borostowski and the door, proceeded to handcuffs and leg shackles on a trip to FBI headquarters, and ended with formal arrest, again with handcuffs and leg shackles.").

Here, the facts are more akin to *Yarborough* and *Stechauner*, than *Borostowski*, for many of the same reasons as already discussed. Again, Defendant's freedom of movement was never

---

[3] In *Berghuis v. Thompkins*, the petitioner had been arrested and questioned regarding a murder. 560 U.S. 370, 374 (2010). After being read his *Miranda* rights, the petitioner was questioned for approximately three hours. *Id.* For two hours and forty-five minutes of such he remained silent before eventually confessing. *Id.* at 376. On *habeas* review he argued that the continued questioning in the face of his silence violated his Fifth Amendment right to remain silent. The Court ultimately held that the petitioner waived his right to remain silent, and that his statements were made voluntarily and free of coercion. Pertinently, the Court noted:

> It is true that apparently he was in a straight-backed chair for three hours, but there is no authority for the proposition that an interrogation of this length is inherently coercive. Indeed, even where interrogations of greater duration were held to be improper, they were accompanied, as this one was not, by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats.

*Id.* at 386-87 (citations omitted).

restricted to a level resembling a formal arrest, nor was he ever physically restrained from moving or told he could not move, except, possibly, for the brief moment when Special Agent Gass went to the front door to retrieve the laptop. Thus, while the length of the interview may weigh in favor of finding that Defendant was in custody, it does not outweigh the various factors suggesting he was not.

### e. Content of the Questions

Finally, Defendant argues that his statements on August 22 ought to be suppressed because of the content of the questioning. Specifically he points to Special Agent Stewart's question about facts, such as the VPN on his work computer, that already incriminated him in the underlying crime. (ECF 67 at 6). He also points to Special Agent Stewart's suggestion that cooperating with them would be in his best interest, and Special Agent Gass's suggestion that he think of his children. (ECF 62 at 10; ECF 67 at 5-6 ). In the alternative, Defendant argues that *Miranda* was triggered when Defendant began to make incriminating statements. (ECF 67 at 6). Defendant also notes that while Agent Stewart told him that he did not have the authority to enter into the so-called third option, he "did not disagree that the Third Option may be able to [be] accomplished." (ECF 67 at 6-7). Again, however, Defendant's arguments are not supported by case law.

In *Oregon v. Mathiason*, the Supreme Court considered an un-*Mirandized* statement made after the questioning police officer told "the defendant he was a suspect in a theft" and "(falsely stated that) defendant's fingerprints were found at the scene." 429 U.S. 492, 493-94 (1977) (quoting *State v. Mathiason*, 549 P.2d 673, 674-75 (Or. 1976) (en banc)). The Court, however, largely disregarded the content of the conversation, and instead focused its analysis on

19

whether the defendant had "been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* (citing *Miranda*, 384 U.S. at 444). The Court ultimately found that the officer's "false statement about having discovered [the defendant's] fingerprints . . . . ha[d] nothing to do with whether [he] was in custody for purposes of the *Miranda* rule." *Id.* at 495-96. Similarly, Special Agent Stewart's question about the VPNs or other evidence that would tend to suggest that Defendant was a suspect in the investigation had nothing to do with whether Defendant was in custody. *See Stansbury*, 511 U.S. at 325 ("[E]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.").

Still more, encouraging a suspect to be truthful, or even suggesting that there may be an eventual benefit to doing so, does not suggest that the suspect is not free to terminate an interview. The Court in *Mathiason*, for example, eventually found that the defendant there was not in custody, even though the questioning officer told him that "his truthfulness would possibly be considered by the district attorney or judge." 429 U.S. 493 (quoting *State v. Mathiason*, 549 P.2d at 674). Similarly, the Supreme Court in *Yarborough* considering another *Miranda* challenge on *habeas* review, held the fact that the questioning officer "appealed to [the defendant's] interest in telling the truth and being helpful to a police officer[,]" was "consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." 541 U.S. at 664-65. *Yarborough* also cuts against Defendant's arguments regarding Special Agent Gass's remark that he should consider his children. Again, the Court there found that it had not been an unreasonable application of law to hold that the

20

defendant was not in custody, even after the questioning officer appealed to the defendant's "sense of justice." *Id*. at 657-58 ("I know it's very difficult when it comes time to 'drop the dime' on somebody[,] ... [but] if that had been your parent, your mother, or your brother, or your sister, you would darn well want [the killer] to go to jail 'cause no one has the right to take someone's life like that ...") (alterations and omissions in original) (quoting appellate record)).

Finally, Defendant's contention that *Miranda* warnings were necessary as soon as he made a statement incriminating himself is inconsistent with much of the case law already cited. In *Fazio*, for example, the interrogation in question was conducted after the defendant had already incriminated himself. There, the defendant informed the police officers executing a search warrant on his restaurant that he had marijuana in his drawer before eventually traveling to the police station and making "incriminating statements concerning his involvement in cocaine trafficking." 914 F.2d at 952. Similarly, in *Yarborough*, at the outset of the interview the defendant denied any involvement in the underlying shooting, then admitted to be present at the carjacking that precipitated it, before eventually admitting that he helped hide the gun used. 541 U.S. at 657-58. Again, the Supreme Court held that it was not an unreasonable application of *Miranda* to hold that the interview was proper, even though the defendant there continued to make increasingly incriminating statements in the course of the interview. Finally, the mere fact that Defendant made an incriminating statement does not objectively go to whether his freedom of movement was restricted, just as the content of Special Agent Stewart's questions did not. As such, it is similarly irrelevant as to whether or not Defendant was in custody.

*f. Coercion*

21

While the questions asked by the agents alone does not suggest that Defendant was not free to terminate the interview, Defendant also at various points in his reply brief suggests that he was coerced into making the incriminating statements at issue. In the factual background section of his initial motion, Defendant states that "Agent Stewart . . . threatened to arrest [him] unless a 'gentleman's agreement' could be reached where [he] would provide the requested information to Agent Stewart." (ECF 47 at 2). Similarly, in his brief in support of his motion, Defendant argues that when Special Agent Stewart described the possibility of Defendant turning himself in instead of being arrested, he "essentially threatened that [Defendant] could be arrested in front of his children if he did not cooperate." (ECF 62 at 10). Again, at the very least, the agents did not tell Defendant that the third option was impossible, only that they did not have the authority to enter into such an agreement. (ECF 67 at 6-7).

Defendant's arguments regarding the effects that these offers or appeals might have had toes the line between what is suppressable under *Miranda* and what is supressable under the Fifth Amendment's Due Process Clause more generally. As already mentioned, *Miranda* is triggered when a suspect is subjected to custodial interrogation. Even if there is no evidence suggesting that the statements were actually coerced, they could be suppressed if they were made absent *Miranda* warnings. *See New York v. Quarles*, 467 U.S. 649, 662 (1984) ("If the *Miranda* warnings were not properly administered or if no valid waiver could be shown, then all responses to interrogation made by the accused 'while in custody ... or otherwise deprived of his freedom of action in any significant way' were to be *presumed* coerced and excluded from evidence at trial." (O'Connor, J., concurring) (omissions in original) (emphasis added) (quoting *Miranda*, 384 U.S. at 476, 479)). Conversely, even if Defendant had waived his privilege

against self-incrimination, he could still challenge "whether his statements were 'voluntary' within the meaning of the Due Process Clause." *Id.* at 661.

To the extent that Defendant is attempting now to raise a Due Process Clause issue, his briefs are insufficient. In *United States v. Kirkland*, the Seventh Circuit held that it was within the district court's discretion to not consider arguments made orally at a suppression hearing that were not clearly briefed. 567 F.3d 316 (7th Cir. 20019). As it stated "Courts are not in the business of formulating arguments for the parties, it is defense counsel's job to develop suppression arguments in a meaningful way so that the government has an adequate opportunity to respond and the district court to make an informed decision." *Id.* at 322 (citations and internal quotation marks omitted). The Court "need not try to imagine every plausible argument that could be extracted from an attorney's comments." *Id.* Here Defendant's potential Due Process Clause arguments fail as he never cites the Due Process Clause or specifically argues that his statements were involuntary.

However, even on the merits, these arguments would fall short. The relevant question in whether statements were made voluntarily is whether or not the interviewee's will is overborne. *Schneckloth*, 412 U.S. at 225-26. "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 226. While a "direct or implied promise, however slight," is impermissible, "an interrogator may discuss the possibility of cooperation with the suspect, or may promise to inform the prosecutor of the suspect's cooperation, as long as the interrogator makes it clear he himself has no power to grant immunity or confer benefits." *United States v. Goldstein*, 611 F. Supp. 626, 631 (N.D. Ill. Jun. 17, 1985)

(citing *United States v. Costello*, 750 F.2d 553, 555 (7th Cir. 1984); *United States v. Guido*, 704 F.2d 675, 677 (2d Cir. 1983) (citations and internal quotation marks omitted)).

In *Costello*, while investigating a possible arson, FBI agents told the appellant that he was a suspect in the investigation and that it would "work to [his] advantage" to cooperate with them.  750 F.2d at 554 (alterations in original).  Pertinently, though, they also told him that while they would inform the United States Attorney's Office of his cooperation, they did not have the authority to offer him immunity.  *Id.*  The Court upheld the appellant's eventual conviction, noting that the FBI agent made clear that there was a risk that cooperation would not lead to immunity, and that the appellant had made "a rational choice to bear that risk."  *Id.* at 555. "[The appellant] suffered a detriment when he proceeded incautiously and volunteered information, but a tactical misjudgment of appellant's own making such as this does not render his conviction in violation of the Due Process Clause."  *Id.* at 556.

In *United States v. Mizyed*, the Seventh Circuit reviewed a similar instance where an appellant challenged the voluntariness of his statement.  927 F.2d 979 (7th Cir. 1991).  There, FBI agents investigating the appellant for wire fraud told him that it would be "better" for him to talk to them, "otherwise they would take him in."  *Id.* at 981.  The appellant argued that the threat to "take him in, 'excited hope and fear' in [him], and thereby 'induced' his confession." *Id.*  The court however rejected his argument.  "The police," it explained, "are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they are just not allowed to magnify [them] . . . to the point where rational decision becomes impossible."  *Id.* at 982 (quoting *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990), *cert. denied*, 489 U.S. 875, 111 (1990)).  The Court reasoned that there was nothing in that statement alone that made a

24

rational choice impossible.

The facts here are substantially analogous to both *Costello* and *Mizyed*. As in *Costello*, Defendant made a tactical choice to try and curry favor with the United States Attorney's Office by cooperating with the FBI. Special Agent Stewart properly informed him that he did not have the authority to guarantee such an arrangement. Defendant in turn made "a rational choice to bear that risk." *Costello*, 750 F.2d at 555. Further, if the risk of being taken into custody immediately does not make a rational choice impossible, it is hard to see how the possibility of being arrested if charges are filed sometime in the future does. As such, even if fully briefed and addressed on the merits, Defendant's Due Process arguments would fail.

*2. August 23 Interview*

Many of the factors that weigh against finding that Defendant was not in custody on the 22nd, are present on the 23rd as well. Once again, Defendant was questioned by two law enforcement officers in plain clothes. He was again told that he was not under arrest and informed that he could terminate the interview anytime. At no point did either agent threaten or yell at him, show or use handcuffs, or unholster their firearms. The interview was alternatively described as "nonchalant" and "calm." Defendant in turn was described as "open." Defendant does not necessarily challenge any of these facts in the argument sections of his briefs. Rather, he raises two chief arguments in favor of a finding that he in custody on the 23rd: (1) the size of the room and the position of Special Agent Stewart and Detective Campbell by the door, and (2) the fact that he had made prior incriminating statements. (ECF 62 at 10; ECF 67 at 7-8). As already discussed however, the mere fact that Defendant made prior incriminating statements does not suggest that his freedom of movement had been impaired to the extent that he was in a

situation akin to a form of custody.

Defendant's argument regarding the size of his office, though, has some force. Specifically, he argues that the small size of the office, that its door was closed, and that Detective Campbell sat near or by the door weigh in favor of finding that he was in custody. In *United States v. Slaight*, the Seventh Circuit held that law enforcement officers violated a defendant's Fifth Amendment rights by questioning him without *Miranda* warning, in part, because of the room used. 620 F.3d 816 (7th Cir. 2010). The room in question there was alternatively described as being either eight by eight feet or five by seven feet in size, was in a local police station, and had no windows. *Id.* at 819. Additionally, the defendant there was seated across a table from two "large" police officers and would have had to "brush by one of the officers, whose seat was so close to the door that the officer might have had to move his chair to allow [him] to exit without touching him" through a closed door. *Id.* Similarly, in *Borostowski*, the Seventh Circuit held that the defendant who was questioned in a thirteen foot, six inch by nine foot, nine inch bedroom was in custody. 755 F.3d at 855. Here, the exact size of Defendant's office was never put in the record, but it was described as small, leaving little room for the officers and Defendant.

The size of the rooms in *Slaight* and *Borostowski*, though, was only one of the factors the Seventh Circuit considered. In *Slaight*, nine uniformed officers entered the defendant's home in the early morning to execute a search warrant with guns drawn and commanded the defendant out of his bed where he had been found. 620 F.3d at 817-18. Afterwards, the defendant was asked to voluntarily accompany the officers to the police station for an interview. *Id.* at 819. The police officers stated that they gave the defendant the option to drive himself to the station,

but as the Court of Appeals specifically noted, the officers knew that the defendant had a suspended license and no car. *Id.* As such, the defendant was transported by police to the station. Once there, despite being told that he was free to end the interview anytime, the defendant was not allowed to exit the interview room for a cigarette break. *Id.* at 820. Further, the defendant stated to the interviewers that he did not feel free to terminate the interview, because he believed that the officers were going to arrest him anyway. *Id.* at 819. The facts of *Borostowski* were substantially similar, in that the interrogation took place after armed police officers performed a early morning search warrant execution, ordered the defendant and his family out of their home, and held the defendant handcuffed on his front lawn before ultimately interviewing him in a small bedroom. 775 F.3d at 854-856.

The facts at issue here, though, are distinguishable from those in *Slaight* and *Borostowski*. As mentioned, there were not multiple officers entering a home unannounced early in the morning with guns drawn. Rather, neither Special Agent Stewart or Detective Campbell were in uniform, unholstered their weapons, showed Defendant handcuffs, threatened him, or otherwise ordered him to speak with them. *See Fazio*, 914 F.2d 955 (noting that the fact that the defendant was not restrained and did not have any guns drawn on him weighed in favor of finding that he was not in custody when asked to sit in an office in his restaurant while officers executed a search warrant). Further, the interview occurred in Defendant's own office, which presumably, was familiar to him. *See United States v. Rainey*, 404 F. App'x 46, 56 (7th Cir. 2010) (concluding that the defendant's statements to detectives at the probation office were voluntary given the familiar setting of the probation office, the non-coercive manner in which she was brought to the office, and the detectives' statements that she was free to leave). Shutting

the door to the office does not necessarily weigh in favor of custody either, for the same reason asking Defendant to step outside during the initial interview did not.  Further, while the room may have been small, Special Agent Stewart testified that there was enough room in front of the desk to allow multiple people to stand.  While an officer may have been between the desk and the door, there is nothing in the record suggesting that Defendant would have had to brush against him to leave the room.  Finally, and most pertinently, Defendant still apparently felt free enough to choose what information he did and did not want to disclose.  Specifically, he turned his desktop monitor away from the Special Agent Stewart and Detective Campbell to prevent them from seeing what he did not want them to see.  *Cf. Slaight*, 620 F.3d at 820 (noting that defendant was not even allowed to leave for a cigarette break weighed in favor of custody).  As such, despite the small size of Defendant's office, on balance, the circumstances weigh in favor of finding that Defendant was not in custody on the 23rd.

### 3.  Failure to Give Warnings or Record Interviews

Finally, Defendant argues that both interviews ought to be suppressed because Special Agent Stewart could have easily given *Miranda* warnings or simply have recorded the interviews.  (ECF 62 at 9).  Particularly, he aks "the Court to take the opportunity to convey that Agent Stewart should have recorded this encounter, since he had ample opportunity."  (ECF 67 at 3-4).  Turning first to the question of whether Special Agent Stewart should have given a *Miranda* warning simply because it would have been easy to do so, Defendant's argument is clearly untenable.  As already discussed at length, the key inquiry under *Miranda* and its progeny regarding custody is whether the objective circumstances surrounding an interrogation present the same inherently coercive pressure found in a traditional station-house interrogation;

generally determined by whether a reasonable person would have felt free to terminate or otherwise leave the questioning. If not, a warning is not necessary, regardless of how easy it would have been to give. Further, there is no indication in any of the above cited cases where courts have found that a *Miranda* warning was not necessary, that the interviewing law enforcement officers were not as able to give a warning as Special Agent Stewart was here. Finding that the lack of a warning weighed in favor of suppression just because the interviewer was capable of giving a warning would be counterintuitive given the body of case law specifically describing instances where such warning was not required.

Regarding the lack of recording, it is again unclear what exactly Defendant is requesting of the Court. To the extent that Defendant is arguing that recording is required, he cites no cases on point. In fact, most courts to have addressed the issue seem to have held the opposite, at least in the context of Due Process concerns. *See United State v. Torres-Galindo*, 206 F.3d 136, 144 (1st Cir. 2000) ("Finally, appellants argue almost in passing that their Fifth Amendment rights were violated by the FBI's practice of not recording confessions, preferring instead to rely on the testimony of the interviewing agent. While the Court recognizes that this practice is susceptible to abuse, the appellants have offered us no evidence or argument that would indicate any impropriety in this case. Nor have they articulated how such impropriety, were it present, might constitute a violation of their Fifth Amendment rights. Even if we shared appellants' frustration with the FBI's practice, the claim is without merit."); s*ee also Trice v. Ward,* 196 F.3d 1151, 1170 (10th Cir. 1999) (noting that there was no precedent requiring the electronic recording of interrogations); *United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988) (finding "there is no constitutional requirement that confessions be recorded by particular means"); *United States v.*

29

*Gualtero*, 62 F. Supp. 3d 479, 487 (E.D. Va. 2014) ("Defendant has . . . failed to establish that his constitutional rights were violated due to the United States law enforcement agents' failure to contemporaneously video or tape record his pre-arrest and post-arrest statements."). In any event, "[a]bsent a proven violation of rights in this case, . . . it is not a matter within [the Court's] power to pass upon." *Torres-Galindo*, 206 F.3d at 144 n.3.

To the extent Defendant is arguing that the lack of video or audio recording weighs against the credibility of the witnesses at the hearing, Defendant's mere allegations that the interviews should have been recorded does not suggest that they were improperly performed, nor does it suggest any underhandedness on the agents' part. Rather as Special Agent Stewart testified on re-direct, recording the interviews would not have been as simple of a matter as Defendant suggests, and could have in fact taken a significant amount of time to arrange. Furthermore, the testimony of Special Agents Stewart and Gass, and Detective Campbell, all largely corroborate each other. As such, as I already concluded, the testimony of the witnesses at the hearing is entirely credible, even without video or audio recording.

In sum, the totality of the circumstances of Defendant's interaction with the agents and Detective Campbell at his home on August 22nd and his office August 23rd do not rise to the level of having restrained Defendant's freedom of movement akin to a formal arrest. Further, Defendant's interaction with the agents "had no indicia of compulsion or government overreaching, such as violence, threats, promises, or unduly protracted interrogation." *Patterson*, 826 F.3d at 459 (citation omitted). Defendant was therefore not in custody for *Miranda* purposes during either interview. Further, any arguments regarding Due Process concerns were improperly briefed, and would, in any event, fail on the merits.

### E. Conclusion

For the above reasons, I CONCLUDE that Defendant's statements were not obtained in violation of *Miranda*. I therefore RECOMMEND that Defendant's motion to suppress (ECF 47) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Entered this 10th day of October 2019.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge